PD-1059-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 8/17/2015 11:43:41 AM
Accepted 8/17/2015 2:53:03 PM
ABEL ACOSTA
CLERK

NO. _____

IN THE

# COURT OF CRIMINAL APPEALS

**OF TEXAS
AUSTIN, TEXAS**

---

### EX PARTE GEORGE WASHINGTON HICKS
**Appellant**

**v.**

### THE STATE OF TEXAS,
**Appellee**

---

## *APPELLANT'S
PETITION FOR DISCRETIONARY REVIEW*

**No. 05-14-00417-CR
COURT OF APPEALS
FOR THE FIFTH DISTRICT OF TEXAS
AT DALLAS, TEXAS**

---

On appeal from Cause Number F-11-00837-W
in the 363RD Criminal District Court
of Dallas County, Texas
Honorable Tracy Holmes, Judge Presiding

---

JOHN TATUM
990 SOUTH SHERMAN STREET
RICHARDSON, TEXAS 75081
(972) 705-9200
BAR NO. 19672500
jtatumlaw@gmail.com
ATTORNEY FOR APPELLANT

FILED IN
COURT OF CRIMINAL APPEALS

August 17, 2015

ABEL ACOSTA, CLERK

# IDENTITIES OF PARTIES AND COUNSEL

1.      The **Honorable Tracy F. Holmes**, Judge Presiding of the 363rd Judicial District Court of Dallas County, presided over the jury trial.

2.      The State of Texas, represented by Assistant Criminal District Attorneys:

        **Brandon Birmingham**, **Bryan Mitchell, Christine Womble**
        Frank Crowley Courts Building
        133 N. Riverfront Blvd. LB 19
        Dallas, Texas 75207-4399

3.      Defendant, **George Washington Hicks**, represented by:

        **John Tatum** ( Trial & Appellate Counsel)
        SBOT NO. 19672500
        2150 S. Central Expwy
        Suite 200
        McKinney, TX 75070

        **Paul Brauchle** (Trial Co-Counsel)
        SBOT# 02918000
        6500 Greenville, Suite 700
        Dallas, Texas 75206-2332

**TABLE OF CONTENTS**

PAGE

INDEX OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv-v

STATEMENT REGARDING ORAL ARGUMENT. . . . . . . . . . . 1

STATEMENT OF CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-2

STATEMENT OF THE PROCEDURAL HISTORY.. . . . . . . . . . 2

**1. The Court of Appeals erred in applying the law to the facts of this case in regard to upholding the trial court's denial of Applicant's motion to dismiss the case at bar due to a violation of Applicant's right to a speedy trial.**

**2. The Court of Appeals erred in applying the law to the facts of this case in regard to upholding the trial court's denial of Applicant's motion to dismiss the case at bar due to a violation of Applicant's right to due process.**

**3.The Court of Appeals erred in applying the law to the facts of this case in regard to upholding the trial court's denial of Applicant's motion to dismiss the case at bar due to the prosecution is barred by the doctrine of laches.**

**4. The Court of Appeals erred in overruling Applicant's Issue No. 7 raised on direct appeal which claimed that Applicant's plea of res judicata/collateral estoppel jeopardy in regard to the allegation in the indictment that Applicant used or exhibited a deadly weapon in this case at bar, because he was prosecuted on the same facts in a companion case in which a deadly weapon finding was not made in the judgement of conviction for murder in the companion case.**

**5. The Court of Appeals erred in holding that there was no violation of the confrontation clause of the United States Constitution as discussed in the cases of *Medenez-Diaz* v. *Massachusetts* , 131 S.Ct. 2705 (2011) and *Burch v. State,* 401 S.W.3d 634 (Tex. Crim. App. 2013) in regard to the testimony of the expert witness Medical Examiner who did not conduct the actual autopsy.**

REASONS FOR REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-19

PRAYER FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . 20

CERTIFICATE OF WORD COUNT. . . . . . . . . . . . . . . . . . . . 20

APPENDIX A      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

# INDEX OF AUTHORITIES

FEDERAL CASES:
*Barker v. Wingo*
407 U.S. 515 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7,10-11

*Dickey v. Florida*
398 U.S. 30 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Moore v. Arizona*
414 U.S. 259 1973)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Smith v. Hooey*
393 U.S. 374 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Strunk v. United States*
412 U.S. 434 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11.13

*United States v. Lovasco*
431 U.S. 783 at 796 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Marion*
404 U.S. 307 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14,15

*Medenez-Diaz* v. *Massachusetts*
131 S.Ct. 2705 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

STATE CASES:
*Burch v. State*
401 S.W.3d 634 (Tex. Crim. App. 2013) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Dragoo*
96 S.W.3d at 315. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Johnson v. State*
233 S.W. 3d 420 (Tex. App.-Ft. Worth, 2007, pet. ref'd).. . . . . . . . . . . . . . . . . . 18

***Perez v. State***
398 S.W.3d 206 (Tex. Crim. App. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

***Turner v. State***
545 S.W.2d 133,137-138 (Tex. Crim. App. 1976). . . . . . . . . . . . . . . . . . . . . . . . . 8


STATUTES, RULES:
5th amendment to the United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . 14

14th Amendment to the United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . 13

6th amendment to the United States Constitution . . . . . . . . . . . . . . . . . . . . . 11,13

Article 9 and 10 of the Texas Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Article 28.061 of the Texas Code of Criminal Procedure . . . . . . . . . . . . . . . . . . . 13

Texas Constitution Article 1, sec. 13 Due Course of Law. . . . . . . . . . . . . . . . . . . 13

## TO THE COURT OF CRIMINAL APPEALS
## OF THE STATE OF TEXAS

**GEORGE WASHINGTON HICKS,**                                    **Appellant**

**v.**

**THE STATE OF TEXAS**                                          **Appellee**

\*\*\*\*\*

### APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

\*\*\*\*\*

TO THE HONORABLE COURT OF CRIMINAL APPEALS:

Comes now the Appellant/Petitioner and respectfully urge the Court to grant discretionary review of the above named cause.

### STATEMENT REGARDING ORAL ARGUMENT

Appellant/Petitioner does not request oral argument at this time; however, if discretionary review is granted Appellant/Petitioner requests oral argument on any issue granted review.

### STATEMENT OF CASE

On March 24th, 2014, the Defendant, George Washington Hicks, entered a plea of not guilty to the offense of Murder. (RR: Vol. 3 p. 5, Vol. 4 p. 93)  The jury found the Defendant guilty of murder as charged in the indictment. (RR: Vol. 7 p. 40)  The trial court assessed punishment at life in the Institutional Division of the Texas Department of Criminal Justice. (RR: Vol. 8 p. 14)

## STATEMENT OF PROCEDURAL HISTORY

The Court of Appeals affirmed the appeal in an opinion delivered on

July 21, 2014 a copy of which is attached hereto as Addendum A.

Appellant/Petitioner now files his Petition for Discretionary Review.

## GROUNDS FOR REVIEW RESTATED

**1. The Court of Appeals erred in applying the law to the facts of this case in regard to upholding the trial court's denial of Applicant's motion to dismiss the case at bar due to a violation of Applicant's right to a speedy trial.**

**2. The Court of Appeals erred in applying the law to the facts of this case in regard to upholding the trial court's denial of Applicant's motion to dismiss the case at bar due to a violation of Applicant's right to due process.**

**3.The Court of Appeals erred in applying the law to the facts of this case in regard to upholding the trial court's denial of Applicant's motion to dismiss the case at bar due to the prosecution is barred by the doctrine of laches.**

**4. The Court of Appeals erred in overruling Applicant's Issue No. 7 raised on direct appeal which claimed that Applicant's plea of res judicata/collateral estoppel jeopardy in regard to the allegation in the indictment that Applicant used or exhibited a deadly weapon in this case at bar, because he was prosecuted on the same facts in a companion case in which a deadly weapon finding was not made in the judgement of conviction for murder in the companion case.**

**5. The Court of Appeals erred in holding that there was no violation of the confrontation clause of the United States Constitution as discussed in the cases of *Medenez-Diaz* v. *Massachusetts* , 131 S.Ct. 2705 (2011) and *Burch v. State,* 401 S.W.3d 634 (Tex. Crim. App. 2013) in regard to the testimony of the expert witness Medical Examiner who did not conduct the actual autopsy.**

## REASONS FOR REVIEW (ARGUMENT)

This Court should review this issue because the Court of Appeals has issued an opinion that in Applicant's belief has departed from the proper application of the facts to the law in the judicial process that calls for an exercise of the Court of Criminal Appeals power of supervision.

## SUMMARY OF THE STATEMENT OF FACTS

Appellant/Petitioner was accused of the murder on December 23rd, 1981, of Roxanne Jeeves and her son Kristopher Korper during the course of abducting them and sexually assaulting Ms. Jeeves.

## ARGUMENT

**1. The Court of Appeals erred in applying the law to the facts of this case in regard to upholding the trial court's denial of Applicant's motion to dismiss the case at bar due to a violation of Applicant's right to a speedy trial.**

**2. The Court of Appeals erred in applying the law to the facts of this case in regard to upholding the trial court's denial of Applicant's motion to dismiss the case at bar due to a violation of Applicant's right to due process.**

Appellant submitted these two issues to the Court of Appeals together as they involved the same facts but different, although related, issues of law.

### Procedural and Factual History of the Case

George Washington Hicks was indicted for two murders arising out of the same criminal transaction on April 29, 2003. The murders of Roxann

3

Jeeves and her 5 year old son, Kristopher Korper, occurred on December 23, 1981 and remained unsolved for more than two decades. On March 8, 2001, hairs recovered from a bag inside the deceased's vehicle were submitted for DNA testing and comparison to any DNA database. The DNA profile was then entered into the Combined DNA Index system (CODIS) and on May 21, 2001, a match was made between the DNA in the Jeeves case and the DNA of defendant Hicks. On September 6, 2001, a witness, Connie Helms, who had seen the unsolved mysteries television show, picked out a photograph of the defendant from a photo line up. On March 17, 2002, a search warrant was executed for the DNA of defendant. Subsequent testing of Defendant's DNA, with hair samples and semen found on the deceased's body during the autopsy of Roxann Jeeves implicated the Applicant.

Mr. Hicks who was serving a sentence in the Texas Dept. Of Criminal Justice was bench warranted to the Dallas County Jail in June of 2003.

Both cases for a jury trial on September 20, 2004. Mr. Hicks and his Attorney were ready to try both cases (F03-21911 & F03-21910) and announced ready to proceed on both cases. The State however, chose only to proceed to trial on the murder of Roxann Jeeves on January 22, 2007.

4

The defendant asserted his right to a "speedy trial" as follows:

On January 22, 2007 at 10:39 am:

THE COURT: My name is Lena Levario, I'm the judge that's presiding over the 204th at this time. Mr. Hicks, you stand charged by indictment of the felony offense of murder. You actually have two cases. One where the complaining witness's name is Roxann Jeeves and the other where the complaining witness's name is Kristopher Korper.
Do you understand what you're charged with?
THE DEFENDANT: Yes, ma'am.
THE COURT: Sir, you have an absolute right to jury trial. And I understand that you do want a jury trial *in each of these cases, correct?*
THE DEFENDANT: *Yes.*
THE COURT: Now, the State prefers to go on the Roxann Jeeves' case. I cannot force them to try the cases at the same time. And the only right you have is to have the cases tried separately .....

THE COURT: Okay. So we will proceed today on the case involving the murder of Roxann Jeeves ....

Later on, after arraignment, Defendant's trial attorney, Mr. Wayne

Huff, stated as follows:

MR. HUFF: Your Honor, just one thing. First of all, let the record reflect that, though we are trying one case, let the record reflect that **the Defendant is ready to try both cases today** . . .
THE COURT: Okay. All right. Is the State ready on the other case?
MS. MULDER: **Yes, we are ready**.

In the murder case involving Roxann Jeeves, the jury found the

accused guilty of the murder of Roxann Jeeves. The trial court then proceeded to

sentence the defendant to Life imprisonment for the murder of Roxann Jeeves in

Cause no, F03-21910, and, ordered that sentence to commence only after the defendant had completed serving his sentence in Cause No. 93-CR1592.

On February 14, 2007, the Assistant District Attorney, on behalf of the State of Texas, filed a motion to Dismiss the Indictment in F03-21911 (Alleging the murder of Kristopher Korper) stating as reasons why the State wanted the case dismissed as follows:

As a result fo the Defendant now serving two long consecutive sentences, any sentence imposed in this case would not in all probability increase the time he is presently serving. As a result, prosecution of this case at this time cannot be justified. In addition, in order to eliminate the overcrowded condition of this Honorable Court's docket and to best serve the interest of the citizens of Dallas County through the more efficient use of judicial and prosecutorial manpower, the District Attorney's Office believes this case should be dismissed without prejudice.

The trial court granted the State's motion to dismiss on 2/19/2007.

On December 21, 2011, the State re-indicted defendant George Washington Hicks for the murder of Kristopher Korper, eight years and eight months after the first Indictment was filed, four years and eleven months after Defendant George Hicks requested a speedy trial, and, both parties announced ready for trial, and thirty years after the murder occurred.

**Speedy Trial Analysis (separate indictments: same charge)**

Applicant submits that the speedy trial clause applies to intervals between separate indictments and between and between separate trials on the same

6

charges. *Dickey v. Florida*, 398 U.S. 30 (1970) at 43.  In the case at bar, the original indictments filed on April 29, 2003 in both cases were filed in the 204th Judicial District Court in Cause no. F03-21919HQ (murder of Kristopher Korper) and in F03-21910HQ (murder of Roxann Jeeves).

The Court of Appeals adequately writes about the factors that go into the determination of this issue pursuant to the case of *Barker v. Wingo*, 407 U.S. 515 (1972) However, Applicant argues that the Court of Appeals erred in applying and balancing the four 'Barker factors' (1) length of delay, (2) reason for delay, (3) the defendant's assertion of his right and (4) prejudice to the defendant to the facts and procedural history of this case.  Applicant states that the Court of Appeals should give great weight against the State for the delay; which the Court did not.  Applicant further states that the Court of Appeal's evaluation that Applicant did not meet his burden that he timely asserted his right to speedy trial as incorrect given a review of the entirely fo the case's procedural history.

Applicant further takes issue with the opinion of the Court of Appeals that he did not show prejudice to himself by the delay.  Finally, under the speedy trial issue, Applicant submits that a balancing of all these factors should have resulted in a conclusion that he was denied his right to a speedy trial.

## Reasons for the Delay.

The State has the burden of justifying a delay in trial. *Turner v. State*, 545 S.W.2d 133,137-138 (Tex. Crim. App. 1976) The reason for the delay is an important factor which must be examined to determine whether the 6th Amendment right to a speedy trial has been violated. These reasons range from necessary on one hand to negligence or intentional bad faith on the other.

In the case at bar, the State's decision to dismiss the indictment in the murder of Kristopher Korper in February 2007 and then approximately five years later to re-indict the Defendant, can not be considered negligence, such as was the case in *Doggett*. Rather, the State who announced that they were ready to try the Korper murder (F03-21911) made a conscious decision, deriving from their absolute authority to "hold a case back" in the event of an acquittal. It was a conscious strategic decision undertaken to gain an advantage in the litigation. In the event of an acquittal or a minimal sentence, the State could then proceed to trial on the Korper murder. Further, the decision was unilateral. Mr. Hicks and his trial attorney were ready to go to trial in January 2007 and announced their willingness to do so. However, as the court pointed out, the decision to try one case only was the State's decision to make, as was the decision to file to dismiss the indictment.

The decision to re-indict was also intentional and the time of the re-indictment was directly related to the fact that in December, 2011, that Mr. Hicks was being considered for parole, The re-indictment of the murder case was designed to derail any possible parole considerations. The state's actions can only be viewed as intentional and designed to gain a strategic advantage. Examining the defendant's position, all Mr. Hicks could do was prepare for trial and announce ready, which was done in open court and on the record. Other than demanding a speedy trial in each case in 2007, the defendant did not have the power to force the State to try the cases together, nor, to force the State to try the Korper murder in 2007 when everyone was ready.

The court did not force the state to trial in light of their motion to dismiss the case. The decision to grant a motion for dismissal is essentially ministerial so long as a reason is presented. The State's reason to dismiss the Korper murder indictment in 2007 was that they were satisfied with a life sentence and that an additional sentence (which would have run concurrently) was not worth the time and effort.

Five years later, after realizing that Mr. Hicks was up for parole, the State seized an opportunity to re-indict in order to perhaps stack some additional time onto the sentences that Mr. Hicks is swerving, and, more importantly, for

purposes of this speedy trial analysis, to also delay and derail any parole considerations. This decision to re-indict was clearly designed to harass and prejudice the defendant and to gain a tactical advantage nearly five years after the State dismissed their case, claiming to be satisfied with the sentence in January 2007.

## Assertion of the Right to a Speedy Trial

A third *Barker-Wingo* factor is the Defendant's assertion of his right to a speedy trial. *Infra.* While in some cases it is clear that the Defendant really does not want a trial, especially not a speedy, that is not the situation here. Immediately upon being bench warranted to the Dallas County Jail in 2003, Mr. Hicks requested assistance of counsel, and the case was set for a jury trial on February 2, 2004. The case was again set for jury trial nine more times. There were no motions for continuance filed by the defense and no announcements of Not Ready for trial. As further evidence that the Defendant did seek speedy and final resolution of these cases, is the record showing that both cases were "special settings" on March 6, 2006 and January 23, 2007.

As the statement facts clearly reflects, the Defendant announced ready for trial on both cases in January 2007 and in fact **asserted his right to jury trial in each case** on that date.

10

**Prejudice to the Defendant because of the Delay.**

The final *Barker-Wingo* factor is the prejudice to the Defendant resulting from the delay. *Infra.* In assessing this factor the court must take into consideration the interests that the right to a speedy trial is intended to protect: "1) to prevent oppressive pre-trial incarceration; 2) to minimize the accused's anxiety and concern; and 3) to limit the possibility that the accused's defense will be impaired." *Id.* At 532. The holding in *Barker-Wingo* emphasizes that, of these factors, "the most serious is the last, because the inability of a defendant to adequately prepare his case skews the fairness of the entire system."*Id.* At 532.

"Excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Dragoo*, 96 S.W.3d at 315. "The Appellant's failure to offer demonstrable evidence of prejudice is not fatal to his claim."*Id.* at 315.

Even in those situations where the accused is incarcerated in a penal institutional on another charge, it is well settled that the defendant is still entitled by the 6th Amendment to a speedy trial. *Smith v. Hooey*, 393 U.S. 374 (1969); *Strunk v. United States*, 412 U.S. 434 (1973); *Moore v. Arizona*, 414 U.S. 259 1973).

As regard to the "anxiety and concern" aspect and effect upon the accused, the United States Supreme Court in *Smith*, relying upon *Klopfer v. North Carolina*, stated: "While it might be argue that a person already in prison would be less likely than others to be affected by "anxiety and concern accompanying public accusation", there is reason to believe that an outstanding untried charge...can have fully as depressive an effect upon a prisoner as upon a person who is at large."

The Defendant was considered for parole in December 2011. Appellant's trial counsel argued in the motion to dismiss that the Defendant was in the process necessary prior to parole one of which is that the defendant would have to diligently participate in counseling. While the parole board was considering the possibility of parole, this decision was sidelined by the indictment filed herein, the issuance of a bench warrant for the defendant to be moved to the Dallas County Jail, and the unknown result of this re-indictment. Clearly this shows actual and ongoing prejudice to the Defendant.

Finally, in terms of actual harm to the defendant, one must look at the most important Barker factor, how the delay affects the defendant's ability to present a defense. In January 2007, when all parties announced ready for trial for both cases, the Defendant's mother, Eva Hicks was available to testify in

mitigation. The defendant's mother was uniquely qualified to testify about the physical and sexual abuse suffered by the defendant in childhood. After 2007, Eva Hicks was subsequently diagnosed with Alzheimers, which may have affected her ability to testify in mitigation. The ability to present mitigation to the jury in a murder case is an essential right in a murder case and has constitutional support.

Once a defendant has established that his right to a speedy trial has been violated, the only possible remedy is dismissal prosecution. *Strunk v. U.S.*, 93 SC 2260 (1973). Because defendant's right to a speedy trial, as guaranteed by the Sixth Amendment to the United States Constitution, and Article I, Section 10 of the Texas Constitution, has been denied, he was entitled to a dismissal of the indictment presented in this case.

At pretrial Appellant moved the trial court to dismiss the indictment filed in this cause pursuant to article 28.061 of the Texas Code of Criminal Procedure for violation of his constitutional right due process of law (Fourteenth Amendment U.S. Constitution and Texas Constitution Article 1, sec. 13 Due Course of Law) The Court of Appeals erred in its analysis of this issue.

## DUE PROCESS VIOLATION CLAIM

Applicant submits that the Court of Appelas erred in finding that the delay in trial in this case did not cause substantial prejudice to Applicant.

13

## United States v. Marion

Trial Counsel argued that statutes of limitation work to limit exposure to criminal prosecution to a certain fixed period of time which serves to protect the accused from the burdens imposed by speedy trial violations. However, in such cases such as murder, no statute of limitation exists in Texas. In *United States v. Marion*, 404 U.S. 307 (1971) the government acknowledged the due process constraints on strategic delays for the Government issue as follows:

> Thus, the Government concedes that the Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the pre-indictment delay in this case caused substantial prejudice to appellees' rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused. Brief for U.S. at 324.

In the case at bar where the decision to re-indict stems from the State not being happy that potentially the defendant could receive parole earlier than they had anticipated, not because the delay was necessary to make sure that they had a case before they indicted the defendant. Further, the defendant had been prejudiced by the delay due to the loss of his mother, which is laid out in more detail in the defendant's speedy trial motion filed previously, and from having to again, five years later, cross examine witnesses in a murder occurring in 1981. In the case at bar, the decision by the State is intentional and opportunistic, in that

14

because of the passage of time, the State was able to derive a tactical advantage where none existed at the time of the dismissal in 2007.

The reason given by the State to the Judge in order to obtain a dismissal in 2007 was that the State was satisfied with the Life sentence for the murder of Roxann Jeeves. Further, the State was satisfied with the Court ordering the Life sentence stacked. It is not necessary to prove that the decision to dismiss the 2003 indictment was done in bad faith as is suggested in the State's brief. To allow the State to take advantage of the normal passage of time in order to gain an advantage over the litigation (depriving the defendant of his back time) and to intentionally circumvent the law applicable in 2007, which would have required the cases to run concurrently, shows that they are seizing upon a tactical strategy in order to obtain an advantage over the defendant. See also *United States v. Lovasco*, 431 U.S. 783 at 796 (1977):

> In *Marion* we noted with approval that the Government conceded that a "tactical" delay would violate the Due Process Clause. The Government renews that concession here, Brief for United States 32 and expands it somewhat by stating: "A due process violation might also be made out upon a showing of prosecutorial delay incurred in reckless disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense."

In the case at bar, if the the delay was not consciously done to obtain a tactical advantage then it clearly was reckless disregard of the circumstances

15

when the State asked the Judge to dismiss because they were satisfied with the Life sentence and the stacking order, when they have now discovered how the parole law applicable to this case (1981) is applied to the defendant's case.

**3.The Court of Appeals erred in applying the law to the facts of this case in regard to upholding the trial court's denial of Applicant's motion to dismiss the case at bar due to the prosecution is barred by the doctrine of laches.**

### Laches Argument

Applicant argues that the Court of Appeals erred in affirming the trial court's denial of Applicant's motion to dismiss the indictment filed in this cause pursuant to the doctrine of laches, an equitable remedy. In *Perez v. State*, 398 S.W.3d 206 (Tex. Crim. App. 2013) the Court of Criminal Appeals discussed the doctrine of laches. Defendant submits that the State of Texas should be barred in the prosecution of this case which allegedly arose out of the same criminal episode or transaction because the State neglected to assert its right or claim to prosecute defendant for such an extended period of time the lapse of time and other circumstances has caused prejudice to the Defendant in his ability to defend this case and or if convicted. Such delay should operate as a bar in a court of equity.

The reason given by the State to the Judge in order to obtain a dismissal in 2007 was that the State was satisfied with the Life sentence for the murder of Roxann Jeeves. Further, the State was satisfied with the Court ordering

16

the Life sentence stacked. It is not necessary to prove that the decision to dismiss the 2003 indictment was done in bad faith as is suggested in the State's brief. To allow the State to take advantage of the normal passage of time in order to gain an advantage over the litigation (attempting to deprive the Defendant of his back time) and to intentionally circumvent the law applicable in 2007, which would have required the cases to run concurrently, shows that they are seizing upon a tactical strategy in order to obtain and advantage over the Defendant.

**4. The Court of Appeals erred in overruling Applicant's issue No. 7 raised in direct appeal which claimed that Applicant's plea of re judicata/collateral estoppel jeopardy in regard to the allegation in the indictment that Applicant used or exhibited a deadly weapon in this case at bar because he was prosecuted on the same facts in a companion case in which a deadly weapon finding was not made in the judgement of conviction for murder in the companion case.**

Applicant submits that the Court of Appeals erred in affirming the trial court's overruling his plea of res judicata/collateral estoppel argument in regard to the allegation and finding that he used or exhibited a deadly weapon since the first judgement in the companion case did not contain such a finding.

An issue necessarily determined by the trier of fact at the former punishment proceeding against defendant in Cause No. F03-219100 was whether or not a deadly weapon was used or exhibited in the criminal episode in which two victims were killed; to-wit: Roxanne Jeeves and her son, Kristopher Korper. The

17

evidence adduced at the trial in F03-21910 showed that both victims were killed during the same transaction or criminal episode. The judge in said cause set punishment and did not make a finding that a deadly weapon was used or exhibited. The prosecutor in that case made the following statement during the trial of that case in support of her proffer of evidence of the extraneous offense against Kristopher Korper to the Court.

(Reporter's Record Volume 4 page 94-95)

"THE COURT: - we're not trying that case. So I just want to know why you say that is going to be relevant.

MS. MULDER: Because the murders happened simultaneously, at the same time . . ."

The judgement rendered in the former proceeding necessarily determined the issue adversely to the prosecution when there was no finding of deadly weapon, and its relitigation in the above-entitled and numbered cause violates defendant's statutory and state and federal constitutional rights to be protected against being put in jeopardy more than once for the same alleged fact of the use or exhibition of a deadly weapon. See also *Johnson v. State*, 233 S.W. 3d 420 (Tex. App.-Ft. Worth, 2007, pet. ref'd).

18

**5. The Court of Appeals erred in holding that there was no violation of the confrontation clause of the United States Constitution as discussed in the cases of *Medenez-Diaz* v. *Massachusetts*, 131 S.Ct. 2705 (2011) and *Burch v. State,* 401 S.W.3d 634 (Tex. Crim. App. 2013).**

Applicant argues that the Court of Appeals incorrectly analyzed the application of the confrontation clause of the United States Constitution to this case where the trial court allowed a different medical examiner than the original express an opinion as to the cause of death. See *Burch v. State*, 401 S.W.3d 634 (Tex. Crim. App. 2013)

### PRAYER

For the reasons stated, it is respectfully submitted that the Court of Criminal Appeals should grant this Petition for Discretionary Review and then reverse the judgment, and remand for a new trial.

Respectfully submitted by,


 /s/ John Tatum
John Tatum

## CERTIFICATE OF SERVICE

I, JOHN TATUM, do hereby certify that a true and correct copy of the foregoing Petition for Discretionary Review for Petitioner was delivered to Susan Hawk, Criminal District Attorney, Appellate Section, 11th floor, Frank Crowley Criminal Courts Building, Dallas, Texas 75207, on this 17th day of August, 2015.


    /s/   John Tatum
    JOHN  TATUM

## CERTIFICATE OF COMPLIANCE OF WORD COUNT PURSUANT TO APPELLATE RULE OF PROCEDURE 9.4

I certify that this document has 4,352 words pursuant to the definitions of length and content in Rule 9.4. (C)(i)(2)(D)

    A. Case Name: George Washington Hicks
    B. The Court of Criminal Appeals
    C. The Type of Document: Petition for Discretionary Review
    D. Party for whom the document is being submitted: Appellant
    E. The Word Processing Software and Version Used to Prepare the Brief: Word Perfect X7
    Copies have been sent to all parties associated with this case.

    /s/ John Tatum          8/17/2015
    (Signature of filing party and date)

## CERTIFICATE OF COMPLIANCE

I certify that this submitted e-mail attachment to file Petition for Discretionary Review complies with the following requirements of the Court:

1. The petition is submitted by e-mail attachment;

2. The e-mail attachment is labeled with the following information:

A. Case Name: George Washington Hicks
B. The Appellate Case Number: NO. 05-14-00417-CR
C. The Type of Document: Petition for Discretionary Review
D. Party for whom the document is being submitted: Appellant
E. The Word Processing Software and Version Used to Prepare the Motion : Word Perfect X7

3. Copies have been sent to all parties associated with this case.

_____/s/ John Tatum_____8/17/2015_____
(Signature of filing party and date)

John Tatum
(Printed name)

John Tatum, Attorney at Law

Emailed Copy of Petition

21

APPENDIX A

**Affirmed as Modified; Opinion Filed July 21, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-14-00417-CR

**GEORGE WASHINGTON HICKS, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 363rd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F11-00837-W**

## MEMORANDUM OPINION

Before Justices Myers, Evans, and Brown
Opinion by Justice Evans

George Washington Hicks appeals his conviction for murder and asserts thirteen issues.

Appellant asserts the trial court erred by overruling his: (1) three *Batson* challenges (issues 1-3); (2) motions to dismiss due to a violation of his right to speedy trial and due process (issues 4-5); (3) motion to dismiss the indictment in the case on grounds it is barred by the doctrine of laches (issue 6); (4) plea of res judicata and collateral estoppel (issue 7); (5) objections to identification testimony (issue 8); (6) objection to the testimony of the medical examiner (issue 9); and (7) objection to the jury argument (issue 11). Appellant also argues that the trial court erred in denying his motion for mistrial (issue 10). Finally, appellant asserts that the evidence is legally insufficient (issue 12) and the judgment does not properly reflect defendant's back-time credit

(issue 13).  We modify the judgment with respect to back-time credit and affirm the judgment as modified.

## I. Background

Before noon on December 23, 1981, a mother, Roxanne Jeeves, and her five-year old son, Kristopher Korper, were murdered in a field in Mesquite.  Both mother and son were shot in the head.  Deputy Sheriff James Cron, a lieutenant in the physical evidence section, photographed the crime scene and recovered a white knit hat and a knife from the crime scene.  Deputy Sheriff Cron found the keys to Jeeves's car and located latent prints on the front passenger window.  A blue bag on the front seat of the car contained a black knit hat with a pin in it saying "Super Shit," duct tape, live ammunition, a small vanilla extract bottle and an antique revolver holster.  He also collected hairs from inside the black knit hat and some cigarette butts from the car.  A small notebook with the name E. Oden in it was also found in the car.  Jeeves's purse and a toy were located in the backseat.  No firearm was recovered.

In March 2001, hairs recovered from the blue bag were submitted for DNA testing and comparison to CODIS (Combined DNA Index System).  There was a hit in the CODIS database.  The DNA profile from the hairs matched appellant's DNA.  In addition, the DNA on one of the cigarette butts found in Jeeves's car matched the DNA on the hairs from the knit cap.  At the time of this discovery, appellant was serving time with the Texas Department of Criminal Justice.

In 2001, the police also interviewed appellant's wife and her brother (Joseph McGary) and son (Derrick McGary).  The brother and son both lived with appellant at the time of the double murders in December 2001.  The brother and son identified the blue bag found in Jeeves's car as belonging to appellant.

On April 29, 2003, appellant was indicted for the murders of Jeeves (Cause No. F03-21910) and Korper (Cause No. F03-21911). In 2006, the rape kit collected from Jeeves was compared to appellant's DNA profile and there was a match. On January 22, 2007, the State elected to proceed only with Jeeves's case and appellant was tried for her murder. The jury found appellant guilty of murder and the trial court sentenced him to life in prison. The trial court further ruled that the life sentence would run consecutively to the 80-year sentence appellant had received for aggravated sexual assault in 1994. In February 2007, the State dismissed Korper's murder case (Cause No. F03-21911) for the following reasons:

> As a result of the Defendant now serving two long consecutive sentences, any sentence imposed in this case would not in all probability increase the time he is presently serving. As a result, prosecution of this case at this time cannot be justified. In addition, in order to eliminate the overcrowded condition of this Honorable Court's docket and to best serve the interests of the citizens of Dallas County through the most efficient use of judicial and prosecutorial manpower, the District Attorney's Office believes this case should be dismissed without prejudice.

In December 2011, appellant was re-indicted for Korper's murder. The indictment charged that appellant had intentionally or knowingly caused Korper's death or had intended to cause serious bodily injury by "shooting the said Kristopher Korper with a deadly weapon, to-wit: a firearm."

On March 24, 2014, appellant entered a plea of not guilty as to the charge of murder. The State presented over twenty witnesses during appellant's murder trial. Roy Baird and James Cron, retired officers from the Dallas Sheriff's Office, testified about the crime scene and what items were recovered. Dr. Jeffrey Barnard, the chief medical examiner for Dallas County, examined the autopsy photographs and concluded that the victim's cause of death was a gunshot wound to the right forehead area. Dr. Barnard noted that there was gunpowder marking the victim's skin surface which means the barrel tip was close enough to the victim when it was discharged that the gunpowder struck the skin surface.

Larry Forsyth, a former detective for the Dallas Sheriff's Office, worked on this case and testified that he had recovered a Texaco receipt from the car. Detective Forsyth spoke with a gas station attendant who stated that Jeeves was driving the car with an African-American man in the front seat and a child in the backseat around 9:30 am or 10:00 am on the day of the murders. In 2001, Detective Forsyth submitted the hairs from the knit cap into CODIS and the DNA in the hairs matched appellant's DNA. Deputy Sheriff Lieutenant Howard Sparks of the Dallas County Sheriff's Office also worked on this case and testified at trial. He noted that the "E. Oden" notebook found at the murder scene belonged to Eugene Oden who worked at an office building where appellant performed cleaning services.

Numerous employees of SWIFS (Southwestern Institute of Forensic Sciences) testified at trial including Joe Paredez, Tim Fallon, Benita Boyd, and Charles Clow. Paredez, as a former autopsy assistant, testified that samples and slides for a rape kit were prepared during Jeeves's autopsy. Fallon, a trace evidence analyst, testified that it was his job to examine hairs, fibers, chemical residues, gunshot residues and other items for criminal and civil investigations. He testified that the small bottle of liquid recovered at the crime scene was ethyl ether and water which could be used as an anesthetic. Boyd, a forensic serologist, testified that as a former employee of SWIFS that it was her job to identify and classify blood and body fluids as well as evidence from a rape kit collected during an autopsy. Boyd testified she examined swabs and smears from the Jeeves autopsy and located the presence of seminal fluid and acid phosphatase. Clow, a former SWIFS employee, testified about his 2006 testing of the three lead fragments in the victim's case and the bullets from Jeeves's case. Clow concluded that the bullets were consistent with bullets coming from a .38 or .357-caliber firearm.

In addition, Lorna Beasley, a former employee of the Texas Department of Public Safety, testified about the DNA testing performed in this case. In 2002, her lab received a blood

specimen and buccal swabs and hair specimen from appellant. Appellant's blood specimen was compared to the root DNA from the hair recovered at the crime scene and it was concluded that appellant was the source of the hair. She testified that the probability of selecting an unrelated person at random who could be the source of this DNA profile is approximately 1 in 10.12 quintillion for Caucasians, 1 in 16.91 quintillion for African-Americans, and 1 in 2.011 quintillion for Hispanics. Beasley also testified that there was a partial profile on the cigarette butt from the crime scene and appellant's known DNA standard matched with the five loci that were present. The statistical weight of this evidence was 1 in 18,670 for Caucasian, 1 in 17,950 for African-Americans, and 1 in 28,010 for Hispanics. Beasley also analyzed the anal smear slides, the vaginal smear slides, and the anal swab from Jeeves's autopsy for the presence of spermatozoa. Beasley determined that the DNA profile from the sperm fraction of the anal swab was consistent with the DNA profile of appellant. The probability of selecting an unrelated person at random who could be the source of this DNA profile is approximately 1 in 94.25 sextillion for Caucasians, 1 in 28.66 sextillion for African-Americans, and 1 in 8.137 sextillions for Hispanics. Jennifer Smith, a DNA analyst with a private DNA testing laboratory, also testified about the testing she performed in this case on Jeeves's underwear and panty liner. Smith testified that she conducted seminal fluid testing on this item and she was able to match the DNA to appellant.

At trial, Derrick and Joseph McGary each identified the blue bag and brown holster recovered from Jeeves's car and testified that they belonged to appellant. Derrick testified that he had seen the blue bag in his mother's (appellant's former wife) room and that it contained a brown holster and revolver. Joseph McGary testified that he lived with his sister and appellant in 1981 and that when he was going through a closet in his sister's room he found a blue bag that contained a holster, gun, duct tape, and rope. Both Derrick and Joseph testified that appellant

often wore toboggan hats with pins with little sayings in them like the one recovered at the crime scene.

Patricia McAvey, Jeeves's next door neighbor, saw an African-American man holding Korper's hand at the apartment complex. Another witness—Tamera Tignor—was near the crime scene on the day of the murders to pick up her grandmother. She saw a "dark complexioned" man running across a field toward Cartwright Road on the morning of December 23, 1981. Connie Helms, who was visiting her father in the area of Lawson and Cartwright Roads on December 23, 1981, heard gunfire and then saw a man coming down the road. The man stopped at the house and asked for a drink of water and her father said no. He asked to use the phone and her father said no. Tignor described the man as a black man with full cheeks, buggy eyes, and unruly hair. She called the police after seeing the murders featured on Unsolved Mysteries and told the officer that she thought she could recognize the suspect. Tignor later identified appellant in a photo line-up.

On March 28, 2014, the jury found appellant guilty of murder and the trial court assessed punishment at life in prison. Appellant then filed this appeal.

## II. ANALYSIS

### A. Peremptory Challenges: Appellant's Batson Challenge to the State's Peremptory Strikes of Juror Nos. 27, 31 and 43 (Issues 1-3)

Appellant argues that the trial court erred in overruling his objections to the jury panel based on the State's misuse of its peremptory challenges. Appellant specifically challenged the State's peremptory strikes of three African-Americans, prospective jurors numbered 27, 31, and 43, as violating *Batson v. Kentucky,* 476 U.S. 79 (1986). Appellant is African-American.

When we review a trial court's ruling on a *Batson* challenge, we "should not overturn the trial court's resolution of the *Batson* issue unless [we] determine[] that the trial court's ruling was clearly erroneous." *Blackman v. State*, 414 S.W.3d 757, 765 (Tex. Crim. App. 2013) (citing

*Herron v. State*, 86 S.W.3d 621, 630 (Tex. Crim. App. 2002)); *see Davis v. State*, 329 S.W.3d 798, 815 (Tex. Crim. App. 2010) ("The trial court's determination is accorded great deference and will not be overturned on appeal unless it is clearly erroneous."). We review the entire record of voir dire, *see Blackman*, 414 S.W.3d at 765, and do so in the light most favorable to the trial court's ruling. *Davis*, 329 S.W.3d at 815. In a *Batson* hearing, "[t]he trial court is the sole judge of the credibility of the witnesses and may choose to believe or disbelieve all or any part of any witness' testimony." *Wiltz v. State*, 749 S.W.2d 519, 520 (Tex. App.—Houston [14th Dist.] 1988, no pet.). The Supreme Court has consistently recognized that credibility determinations of the trial court should be given great deference on appellate review. *See Batson*, 476 U.S. at 98 n.21 ("Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference.").

The first step of a *Batson* challenge begins when a challenger makes "a *prima facie* showing of racial discrimination in the state's exercise of its peremptory strikes." *Davis*, 329 S.W.3d at 815 (citing *Herron,* 86 S.W.3d at 630). Then, in the second step, the burden shifts to the party making the strikes to articulate race-neutral explanations for its strikes. *Id.* Once the party making the strikes has articulated race-neutral explanations, in the third step, the burden shifts back to the challenging party to show that the explanations are a pretext for discrimination. *Id.* The trial court must then determine whether the challenging party has carried its burden of proving discrimination. *Id.*

When a party challenges an opponent's strike on the basis of purposeful discrimination, if the trial court proceeds immediately to the second step by inquiring of the proponent whether he had a non-discriminatory purpose, a reviewing court is to assume that the opponent has satisfied his step-one obligation to make a prima facie case of purposeful discrimination and address only

the second and third steps. *Watkins v. State*, 245 S.W.3d 444, 447 (Tex. Crim. App. 2008). At the second step of the analysis, there is no fact-finding to be done. The trial court simply accepts the explanation for the strike at face value and determines whether it is a reasonably specific race-neutral reason. *See Purkett v. Elem*, 514 U.S. 765, 768 (1995). Unless a discriminatory intent is inherent in the explanation, the reasons offered will be deemed race neutral. *See id.*; *see also Fritz v. State*, 946 S.W.2d 844, 847 (Tex. Crim. App. 1997) (discriminatory intent inherent in reason for peremptory challenge that males under the age of thirty would identify with opponent). "Thus, it is only at step three 'that the persuasiveness of the justification becomes relevant—the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination.'" *Guzman v. State*, 85 S.W.3d 242, 246 (Tex. Crim. App. 2002) (citing *Purkett*, 514 U.S. at 768).

Here, appellant challenged the State's striking of prospective jurors numbered 27, 31, and 43. Because the trial court immediately moved to step two, we assume the validity of appellant's initial challenges. *See Watkins*, 245 S.W.3d at 447. The State then gave reasonable, race-neutral reasons for its strikes. For prospective juror number 27, the State argued that (1) she would require more than one eyewitness as stated in the jury selection portion and (2) her husband had recently been prosecuted by the District Attorney's Office. For prospective juror number 31, the State noted her questionnaire answers included statements to the effect that: (1) she was "beyond displeased with her treatment" by a judge and (2) that the "entire system could not be fair and she doesn't believe in it." The State also noted that this prospective juror had a previous DWI conviction. Finally, the State argued that it struck prospective juror number 43 because she indicated on her questionnaire that she could not sit in judgment of another human being. In accordance with the second stage of a *Batson* challenge, the trial court merely accepted these proffered reasons as race-neutral, but did not determine whether they were persuasive. *Guzman*,

85 S.W.3d at 246 (citing *Purkett*, 514 U.S. at 768). Appellant did not make any further argument and the court overruled the challenges.

Thus, we are asked to decide whether the trial court clearly erred by failing to find that the State's proffered reasons were pretexts for race discrimination. The United States Supreme Court has identified several factors to be considered in assessing the striking party's true motives for a peremptory strike, including:

> • that the State exercised its peremptory challenges to eliminate a far greater proportion of the African–American veniremen than the non-African-American veniremen;
> • that the reasons the State asserted for eliminating the African–American veniremen in question appeared to apply equally well to many of the non-African-American veniremen whom the State did not challenge;
> • that the State utilized its option to shuffle the jury panels in a manner that supported an inference of race discrimination; and
> • that the State directed questions expressly designed to elicit grounds for peremptory challenges disproportionately, in a manner that suggested an intent to single out African–American veniremen for elimination.

*Watkins,* 245 S.W.3d at 448–49. Here, the State did not use its peremptory challenges to eliminate a far greater portion of African-American prospective jurors than non-African-American prospective jurors. During the hearing, the State noted as follows:

> The numbers in the breakdown that I see in the strike zone, which is the relevant zone for the Court to consider, there were four Hispanics in the strike zone. There were nine African-Americans in the strike zone. There were 17 Caucasians in the strike zone. And four Asian or Pacific Islanders in the strike zone. The State exercised zero out of four peremptory challenges on Hispanics. We struck three out of nine that are in the strike zone, not 22 out of the whole panel. Of the nine that are actually in the strike zone, we exercised three peremptory strikes, leaving six. We struck of the 17 Caucasians, five of them -- out of the 17. And then one of the Asian Pacific Islanders.

Further, the State eliminated non-African-American potential jurors for the same reasons that it eliminated African-American potential jurors. As discussed above, the State eliminated potential juror number 43 because she indicated on her questionnaire that she could not sit in judgment of

another human being.  The State also noted during the *Batson* hearing that it struck potential juror number 28, a white female, for the same reason.  Specifically, the State argued:

> And the reason that we struck [potential juror number 43] is because on her questionnaire she indicated that she could not sit in judgement [sic] of another human being.  It is true that during voir dire she explained that what she really meant by that was that she had misgivings about the death penalty, but I struck Juror Number 43 for that reason, which is the same that I struck Juror Number 28 who is a white female who was similarly situated in the panel.

Appellant makes no argument nor do we have any evidence that the State either utilized its option to shuffle the jury panels in a manner that supported an inference of race discrimination or directed questions expressly designed to elicit grounds for peremptory challenges disproportionately and in a manner that suggests an intent to single out African–Americans for elimination.  Thus, our review of the record supports the trial court's ruling and we cannot say the trial court clearly abused its discretion.  Accordingly, we overrule appellant's first three issues.

### B.  *Motions to Dismiss:  Appellant alleges violations of his right to speedy trial and due process and argues that the indictment is barred by doctrine of laches (Issues 4-6)*

Appellant argues that the trial court erred in overruling his motions to dismiss based on violations of his right to speedy trial and due process.  Appellant also argues that the trial court erred in overruling his motion to dismiss based on the doctrine of laches.  We disagree.

The two murders occurred on December 23, 1981.  Appellant was separately indicted for each murder on April 29, 2003.  On January 22, 2007, appellant's attorney stated for the record that he was ready to try both cases.  The State, however, elected to proceed with only the Jeeves case.  The jury convicted appellant and he received a life sentence for Jeeves's murder.  As appellant was already serving an eighty-year sentence for a prior crime, the judge ordered the life sentence to commence only after appellant had completed serving his sentence for the prior

–10–

crime. On February 14, 2007, the State filed a motion to dismiss the indictment for Korper's murder for the following reasons:

> As a result of the Defendant now serving two long consecutive sentences, any sentence imposed in this case would not in all probability increase the time he is presently serving. As a result, prosecution of this case at this time cannot be justified. In addition, in order to eliminate the overcrowded condition of this Honorable Court's docket and to best serve the interests of the citizens of Dallas County through the most efficient use of judicial and prosecutorial manpower, the District Attorney's Office believes this case should be dismissed without prejudice.

On December 21, 2011, appellant was re-indicted for Korper's murder. On March 8, 2012, appellant filed a handwritten motion to set aside indictment for denial of speedy trial but withdrew the motion later that month. Appellant then filed a speedy trial demand on September 4, 2012. On October 26, 2012, appellant filed a motion to dismiss the indictment with prejudice for denial of his right to a speedy trial. The State filed a response to this motion on October 29, 2012. On November 1, 2012, appellant filed a motion to dismiss the indictment for denial of his right to due process of law.

On November 1, 2012, the trial court held a hearing on these motions to dismiss. For purposes of the speedy trial allegation, appellant's counsel stated that appellant was only contesting the time period beginning on the date that appellant was ready to go to trial (January 22, 2007). The State called three witnesses: (1) Nancy Mulder, the former assistant district attorney who tried the Jeeves case; (2) Brandon Birmingham, the lead prosecutor with the district attorney's office in the Korper case; and (3) Layne Fulps, an investigator with the district attorney's office. Mulder testified that it was a tactical decision not to proceed with Korper's case. Mulder noted that Jeeves's case was the stronger case but if her case had resulted in a not guilty verdict or a hung jury, she wanted to be able to proceed with Korper's case. She also testified that she dismissed Korper's case because she thought appellant would die in prison, not because it would give her a tactical advantage over appellant. Birmingham testified that he had

been actively working on preparing the case for trial. Fulps testified that all of the witnesses from the 2007 trial had been located. Following the hearing, the trial court denied the motions to dismiss. Appellant's trial began on March 14, 2014. On March 25, 2014, appellant filed a motion to dismiss indictment based on the doctrine of laches. The court denied the motion.

### 1. Speedy Trial

The Sixth Amendment of the United States Constitution provides in part, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial," thereby guaranteeing an accused the right to a speedy trial. U.S. CONST. amend. VI; *see Barker v. Wingo*, 407 U.S. 514, 515 (1972). This right was made applicable to state criminal prosecutions by the Due Process Clause of the Fourteenth Amendment. *See Klopfer v. North Carolina*, 386 U.S. 213, 223 (1967). If a violation of the speedy trial right is established, the only possible remedy is dismissal of the prosecution. *Dragoo v. State*, 96 S.W.3d 308, 313 (Tex. Crim. App. 2003). As dismissal is a radical remedy, the courts must apply the *Barker* balancing test with common sense and sensitivity to ensure that charges are dismissed only when the evidence shows that a defendant's actual and asserted interest in a speedy trial has been infringed. *See Cantu v. State*, 253 S.W.3d 273, 281 (Tex. Crim. App. 2008) (en banc) The constitutional right is that of a speedy trial, not dismissal of the charges. *Id.*

The court must balance four factors when analyzing a speedy trial claim: (1) length of delay; (2) reason for delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant. *Barker*, 407 U.S. at 530. While the State has the burden of justifying the length of delay, the defendant has the burden of proving the assertion of the right and showing prejudice. *See Cantu*, 253 S.W.3d at 280. The defendant's burden of proof on the two factors varies inversely with the State's degree of culpability. *Id.* The four factors must be considered together along with other relevant circumstances and the court must engage in a difficult and sensitive

balancing process in each case. *Id.* at 281. There is a bifurcated review of a trial court's ruling on a speedy trial claim—abuse of discretion standard for the factual components and a de novo standard for the legal components. *Id.* at 282. This means that we independently weigh and balance the *Barker* factors but we presume the trial court resolved any disputed fact issues in a manner that supports its ruling. *See Zamorano v. State*, 84 S.W.3d 643, 648 (Tex. Crim. App. 2002).

### a) *Length of delay*

Appellant argues various lengths of delay. In his motion to dismiss filed on October 26, 2012, appellant argued a length of delay between the first indictment (April 29, 2003) and the second indictment (December 21, 2011). At the hearing on the motion to dismiss, however, appellant's counsel stated that appellant was only contesting the time period beginning on the date that appellant was ready to go to trial (January 22, 2007). In his appellate brief, appellant again argues the length of time between the first and second indictments and cites *Dickey v. Florida*, 398 U.S. 30, 43 (1970) in support of the assertion that the speedy trial clause applies to intervals between separate indictments and between separate trials on the same charges. Appellant, however, fails to note that his citation refers to a passing reference made by Justice Brennan in a concurring opinion, not the opinion of the Supreme Court. Following the *Dickey* opinion, the Supreme Court clarified what amount of time may be considered in a speedy trial claim:

> Although delay prior to arrest or indictment may give rise to a due process claim under the Fifth Amendment, see *United States v. Lovasco*, 431 U.S. 783, 788-789, 97 S.Ct. 2044, 2047-48, 52 L.Ed.2d 752 (1977), or to a claim under any applicable statutes of limitations, no Sixth Amendment right to a speedy trial arises until charges are pending. Similarly, the Speedy Trial Clause has no application after the Government, acting in good faith, formally drops charges. Any undue delay after charges are dismissed, like any delay before charges are

–13–

filed, must be scrutinized under the Due Process Clause, not the Speedy Trial Clause.

*U.S. v. MacDonald*, 456 U.S. 1, 7 (1982). In making this holding, the Supreme Court noted that the primary purpose behind the Sixth Amendment right to a speedy trial is *not* to prevent prejudice to the defense caused by the passage of time. *Id.* at 8. Instead, the speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges. *Id.*

Here, the State formally dismissed the charges against appellant for Korper's murder on February 14, 2007. Accordingly, appellant cannot assert a length of delay from April 29, 2003 until December 21, 2011 under the speedy trial clause. Instead, the length of the delay is measured from the time the defendant is arrested or formally accused. *See Dragoo*, 96 S.W.3d at 313. In general, delay approaching one year is sufficient to trigger a speedy trial inquiry. *See Shaw v. State*, 117 S.W.3d 883, 889 (Tex. Crim. App. 2003). Here, appellant was indicted in this case on December 21, 2011, and his trial began on March 14, 2014. Accordingly, a delay of almost 27 months occurred between the appellant's indictment and his trial.[1] This delay was sufficient to trigger a speedy trial inquiry.

### b) *Reason for delay*

The second factor involves the reason for the State's delay. When a court assesses this factor, different weights must be assigned to different reasons. *Barker*, 407 U.S. at 531. A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. *Id.* A more neutral reason such as negligence or overcrowded courts

---

[1] Although appellant could also have raised the time period from the first indictment (April 23, 2003) through his dismissal in the first case (February 14, 2007), appellant did not specifically address this time period.

should be weighted less heavily and a valid reason—such as a missing witness—should serve to justify appropriate delay. *Id.*

In response, the State offered the following reasons for the delay in its October 29, 2012 response to appellant's motion to dismiss:[2]

> At the time of the defendant's December 21, 2011 indictment, thirty years had passed since the date of the offense. The prosecutor currently assigned to the case, Mr. Brandon Birmingham, is not the prosecutor who tried the defendant in 2007 for Roxann's [sic] murder. Mr. Birmingham has required a reasonable amount of time to review the District Attorney's file regarding the investigation into the 1981 double murder, review the eight volume transcript of the 2007 trial, ascertain the location of physical evidence, locate and interview witnesses, and evaluate the case in light of changes in the law since the 2007 trial. Mr. Birmingham has also had to prepare the District Attorney's file, which commands several drawers of a file cabinet, for discovery. To say that Mr. Birmingham has had a large volume of information to review, evaluate, organize, and prepare for trial would be an understatement.

In addition, the State noted that some of appellant's own actions could have delayed the trial. The State points out that, following the speedy trial hearing, appellant changed attorneys twice and filed motions for appointments of experts and investigators. Considering the age of the case and the size of the file, we conclude that the reasons for this delay were neither valid nor a deliberate attempt to hamper the defense, so we weigh the delay against the State but not heavily.

### c) *Defendant's assertion of right*

The defendant's assertion of his right to a speedy trial is entitled to strong evidentiary weight in determining whether he has been deprived of his right. *Barker,* 407 U.S. at 531–32. Failure to assert the right in a timely and persistent manner will make it difficult for a defendant to provide that he was denied a speedy trial. *Id.* at 529. Also, seeking a dismissal, rather than a trial, may attenuate the strength of a speedy trial claim. *Phillips v. State*, 650 S.W.2d 396, 401 (Tex. Crim. App. 1983).

---

[2] At the time of the State's response to the motion to dismiss, this case had been pending less than one year.

–15–

In this case, appellant was indicted for the second time on December 21, 2011. On March 8, 2012, appellant filed a handwritten motion to set aside the indictment for denial of speedy trial, but withdrew the motion later that month. Appellant then filed a speedy trial demand on September 4, 2012. On October 26, 2012, appellant filed a motion to dismiss the indictment with prejudice for denial of his right to a speedy trial. The court held a hearing on November 1, 2012, and denied appellant's motion. Following this hearing, the record lacks any reassertion by appellant to his speedy trial rights. Further, the record reflects that appellant filed an agreed motion for continuance on January 30, 2014. Appellant also filed a motion for continuance on March 20, 2014, which the court denied.

Appellant argues that he announced "ready" for trial of both cases in January 2007. As the State points out, however, announcing "ready for trial" is not the same as demanding a speedy trial. *See Henson v. State*, 407 S.W.3d 764, 769 (Tex. Crim. App. 2013) ("[Defendant] claims that announcing ready was such a demand. However, this is not a *demand* for a speedy trial; instead, it merely asserts that he could go to trial at that moment should the State push for it. A speedy-trial demand should be, at the very least, unambiguous."). In this case, the only unwithdrawn request for a speedy trial came on September 4, 2012. Shortly after filing the request, appellant filed a motion to dismiss indictment with prejudice for denial of his right to a speedy trial. However, after the trial court denied this motion, appellant did not reassert his request for a speedy trial. In fact, appellant subsequently agreed to one trial continuance and requested a second one. Based on these facts, we cannot say that appellant met his burden.

### d) *Prejudice to defendant*

Prejudice must be assessed in light of the interest a speedy trial is designed to protect. *Barker,* 407 U.S. at 532. These interests are as follows: (1) preventing oppressive pretrial incarceration; (2) minimizing anxiety and concern of the accused; and (3) limiting the possibility

that the defense will be impaired. *Id.* Of these three, the most serious is the last, because the inability of the defendant to prepare a defense skews the fairness of the entire system. *Id.* A defendant has the burden to make some showing of prejudice although a showing of actual prejudice is not required. *State v. Munoz,* 991 S.W.2d 818, 826 (Tex. Crim. App. 1999) (en banc). Further, when a defendant makes a prima facie showing of prejudice, the State carries the obligation of proving that the accused suffered no serious prejudice beyond that which result from the ordinary and inevitable delay. *Id.*

Here, the record reflects that appellant was incarcerated during the entirety of this case for previous convictions. Accordingly, appellant cannot demonstrate oppressive pretrial incarceration due to lack of a speedy trial. Further, appellant has not provided any evidence as to any anxiety or concern caused by this delay. As for how his defense has been impaired, appellant asserts two arguments. First, appellant argues that he was prejudiced because in December 2011, he was being considered for parole and the indictment in this case "sidelined" his potential parole. Appellant neither provides any record citations regarding his parole nor any legal citations as to how his loss of parole from an indictment results in prejudice under a speedy trial analysis. Second, appellant argues that his mother, Eva Hicks, would have been able to testify in January 2007 but she was subsequently diagnosed with Alzheimer's and then passed away in 2012. Appellant asserts that she was uniquely qualified to testify about the physical and sexual abuse suffered by appellant and he was prejudiced by her inability to testify at his 2014 trial. Appellant argues that the ability to present mitigation evidence in a murder case is an essential right. In support of his argument, appellant cites *Tennard v. Dretke,* 542 U.S. 274 (2004) and *Brewer v. Quarterman*, 550 U.S. 286 (2007). Neither of these cases is a speedy trial case. Instead, they are capital murder cases involving a defendant's right to have juries consider mitigating evidence in deciding whether to issue the death penalty. In this case, however,

appellant was not charged with capital murder. In addition, appellant fails to explain how his mother's testimony would have been relevant to his sentencing in this case. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1) (West Supp. 2014) ("Regardless of the plea and whether the punishment be assessed by the judge or the jury, evidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing, including but not limited to the prior criminal record of the defendant, his general reputation, his character, an opinion regarding his character, the circumstances of the offense for which he is being tried . . . ."). Further, we note that appellant does not address whether his mother testified at the Jeeves murder trial as a mitigating witness. In the State's Response and Objection to Defendant's Motion to Dismiss Indictment with Prejudice for Denial of Defendant's Constitutional Right to a Speedy Trial, however, the State noted that appellant "did not call his mother as a witness at his 2007 trial, at a time when, by his own admission, she was available and willing to testify." When appellant's counsel raised the mitigating witness argument at the motion to dismiss hearing, the State responded as follows:

> All of the State's witnesses are available to testify. The defense asked the investigator whether she -- whether he contacted any of the defense witnesses. The fact of the matter is, is that other than re-calling one witness for cross-examination, the defense did not put on any evidence -- any witnesses at the 2007 trial. Therefore, I think it would be very difficult for the defendant to say now that he has been prejudiced. He didn't call anybody back in 2007, five years ago. Even -- even his mother, he didn't call his mother at that 2007 trial.

Based on the arguments and evidence put forth by the parties, we conclude that the State met its burden to persuasively rebut the presumption of prejudice.

### e) *Balancing the factors*

Having addressed the four *Barker* factors, we now balance them. Although the first two factors weigh against the State, the second two factors weigh against the appellant. Having

–18–

reviewed the facts before us, we reach the same conclusion as the trial court that appellant's right to a speedy trial was not violated and overrule appellant's fourth point of error.

### 2. Due Process

Appellant argues that the trial court erred in overruling his motion to dismiss based on violations of his right to due process. We disagree.

Although statutes of limitation are the primary guarantee used to protect citizens from stale criminal charges and charging delays, the Due Process Clause of the Fifth Amendment has a limited role to play in protecting against oppressive delay. *See State v. Krizan-Wilson*, 354 S.W.3d 808, 813–14 (Tex. Crim. App. 2011). In order to be entitled to relief, however, the defendant must demonstrate that the delay: (1) caused substantial prejudice to his right to a fair trial and (2) was an intentional device used to gain a tactical advantage over the accused. *Id.* at 814–15. There must be proof of both elements. *Id.* at 817; *State v. Ford*, 410 S.W.3d 341, 347 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd).

There is a bifurcated review of a trial court's decision to dismiss a case. *Krizan-Wilson*, 354 S.W.3d at 815. The court of appeals must give almost total deference to a trial court's findings of facts that are supported by the record, as well as mixed questions of law and fact that rely upon the credibility of a witness. *Id.* However, the court of appeals applies a *de novo* standard of review to pure questions of law and mixed questions that do not depend on credibility determinations. *Id.*

#### a) Substantial prejudice

In his due process claim, appellant reasserts that he was prejudiced by the delay due to the loss of his mother and her inability to testify. For the reasons set for above in the speedy trial analysis, we conclude that appellant has failed to demonstrate substantial prejudice.

–19–

### b) *Tactical advantage*

A defendant has the burden to prove that the State's delay was an intentional device used to gain a tactical advantage or for some other improper purpose. *Ford*, 410 S.W.3d at 347. Appellant argues that the State only decided to re-indict appellant after the State found out he was eligible for parole and that the State derived a tactical advantage from the passage of time.

In the hearing on the motions to the dismiss, Nancy Mulder, the former Assistant District Attorney who tried the Jeeves case, testified for the State. Mulder testified that the decision not to proceed with Korper's case was not done to gain a tactical advantage over appellant from the passage of time. Instead, Mulder noted that she proceeded with Jeeves's case because it was the stronger case and she held Korper's case back in case the Jeeves case had resulted in a not guilty verdict or a hung jury. She also testified that she dismissed Korper's case because she thought appellant would die in prison. Following the hearing, the trial court made the following conclusions:

> With regard to severing in 2007, I take judicial notice that I think severing happens more often than not down here on a decision that the State makes more often than not to sever the cases, so I don't find anything unusual or any kind of bad faith with regard to them not trying both cases in 2007. With regard to due process, I do not find that the State's dismissal in 2007 was an intentional device to gain any tactical advantage, and the motion is denied.

Accordingly, it appears that the trial court believed Mulder's testimony and we defer to the trial court's finding of fact based on the credibility of a witness. *Krizan-Wilson*, 354 S.W.3d at 815. Thus, we affirm the trial court's denial of the motion to dismiss and overrule appellant's fifth issue.

### 3. *Laches*

Appellant argues the trial court erred in overruling his motion to dismiss based on the doctrine of laches. Specifically, appellant cites *Ex parte Perez* for the proposition that the equitable remedy of laches bars the State from prosecuting him for Korper's murder. 398

–20–

S.W.3d 206 (Tex. Crim. App. 2013). In *Ex parte Perez*, the court altered the parameters of the equitable doctrine of laches as it applies to bar a long-delayed application for a writ of habeas corpus. *Id.* at 208. Specifically, the court adopted the Texas common-law definition of the doctrine of laches and rejected its prior federal laches standard as stated in *Ex parte Carrio*, 992 S.W.2d 486 (Tex. Crim. App. 1999).

Both *Ex parte Perez* nor *Ex parte Carrio* are factually distinguishable from this case as neither involved any assertion of pre-indictment delay. The court of criminal appeals has previously rejected extending use of the doctrine of laches into the realm of pre-indictment delay:

> *Carrio* is not a pre-indictment delay case. In it, the court followed the federal practice of using laches to assess the consequences of delay in applications for writ of habeas corpus. *Id.* at 487. This is a very narrow use of this equitable doctrine. There is no suggestion in the opinion that the doctrine should apply in any other criminal context. We see no reason to extend use of the doctrine into the realm of pre-indictment delay, where the Court of Criminal Appeals has already set forth a test governing our analysis. *See Ibarra,* 11 S.W.3d at 193–94. For this reason, we find that the trial court erred in dismissing the indictment pursuant to the doctrine of laches.

*See State v. Krizan-Wilson*, 321 S.W.3d 619, 629 (Tex. App.—Houston [14th Dist.] 2010), *aff'd,* 354 S.W.3d 808 (Tex. Crim. App. 2011). Accordingly, we affirm the trial court's decision to deny the motion to dismiss and overrule appellant's sixth issue.

## C.     Plea of Collateral Estoppel (Issue 7)

Appellant argues that the trial court erred in overruling his plea of res judicata/collateral estoppel in regard to the allegation that he used or exhibited a deadly weapon. We disagree.

In 2003, appellant was indicted for the murder of the Jeeves. The indictment for that murder charged appellant as follows:

> intentionally and knowingly cause the death of ROXANNE JEEVES, an individual, by shooting the said ROXANNE JEEVES with a firearm, a deadly weapon,

And unlawfully then and there intend to cause serious bodily injury to ROXANNE JEEVES and did then and there commit an act clearly dangerous to human life, to-wit: by shooting the said ROXANNE JEEVES with a firearm, a deadly weapon, and did thereby cause the death of ROXANNE JEEVES, an individual.

The jury charge provided that the appellant should be found guilty if he "intentionally or knowingly cause the death of ROXANN [sic] JEEVES, an individual, by shooting the said ROXANN [sic] JEEVES with a firearm, a deadly weapon." In January 2007, the jury convicted appellant and the verdict form specifically found appellant "guilty of the offense of murder, as charged in the indictment." When the judge set punishment, however, he did not include a finding that a deadly weapon was used or exhibited in the judgment. In this case, appellant's indictment also included a deadly weapon charge. The jury charge and the judgment also included a deadly weapon finding.

Appellant now argues that the trial court was collaterally estopped from making a deadly weapon finding in this case since no deadly weapon finding was made in the mother's case and the murders took place at the same time. Appellant, however, misconstrues the law. The jury in the Jeeves case convicted appellant "as charged in the indictment." As stated above, that indictment included a deadly weapon finding. When the trier of fact makes an affirmative finding that a deadly weapon was used, the trial court shall enter the finding in the judgment of the court. *See* TEX. CODE CRIM. PROC. ANN. art. 42.12, § 3g(a)(2) (West Supp. 2014) ("On an affirmative finding under this subdivision, the trial court shall enter the finding in the judgment of the court."); *McCallum v. State*, 311 S.W.3d 9, 19 (Tex. App.—San Antonio 2010, no pet.). It is clear from the facts above that (1) the jury, not the trial court, was the factfinder; (2) an affirmative finding was made; and (3) the trial court should have entered a deadly weapon finding in its judgment in the Jeeves case. Thus, by definition, collateral estoppel does not apply in this case. The Texas Court of Criminal Appeals has previously held that the "key to collateral

estoppel is that the *original* factfinder, whether judge or jury, has necessarily determined an essential fact." *Rollerson v. State*, 227 S.W.3d 718, 730 (Tex. Crim. App. 2007). Here, the jury, not the judge, determined the issue of the deadly weapon finding in the Jeeves case. Accordingly, we overrule appellant's seventh issue regarding collateral estoppel.

### D.  *Overly Suggestive Line Up (Issue 8)*

Appellant argues that the trial court erred in overruling appellant's objections to the identification testimony due to an overly suggestive line-up. For the reasons discussed below, we disagree.

### 1)  **Factual Background**

The trial court held a pretrial hearing to address appellant's motion to suppress illegal identification of the defendant and request hearing outside the presence of the jury. During the hearing, Deputy Sparks testified that he developed appellant as a suspect in 2001 after appellant's DNA from the crime scene matched the appellant's DNA in CODIS. Deputy Sparks testified that he obtained a photograph of appellant and gathered additional photographs with the same tinting of men matching appellant's general description and age. A witness, Connie Helms, had previously contacted the police in the 1990's about a man she had seen walking down the street at the time of the murder. Deputy Sparks prepared the photographic lineup for Helms to review. On September 5, 2001, Deputy Sparks, his partner and the original detective from 1981, Larry Forsyth, went to see Connie Helms. The men asked Helms to view a photo lineup but did not offer any instruction other than if she recognized anyone. Helms identified appellant's photograph but noted that he was younger and had hair when she saw him. At that time, Deputy Sparks realized that he had placed a 1994 photograph of appellant in the lineup rather than the 1984 photograph. Detective Sparks then pulled out the 1984 photograph of

appellant and Helms said "that's him." Detective Sparks testified that he did not attempt to influence Helms's identification. The trial court denied the motion.

At trial, Detective Forsyth testified about the photographic lineup and noted that Helms went straight up to appellant's 1994 photograph and said "that's him, that's the man that walked up in my front yard" and "that's him, but he had more hair back then." Forsyth also testified that when she saw the 1984 photograph Helms stated "yes, that's him" and "oh, good, because I – I thought maybe I had picked the wrong man when y'all said you wanted to show me another picture." Forsyth noted that they never told Helms that they had a suspect in custody. Helms also testified at trial and she stated that she called the police because she felt like she "still had a picture of this man in my mind." Helms described the suspect as having full cheeks, buggy eyes, and unruly hair. She testified that she is one hundred percent sure that the man she saw in 1981 was the appellant.

### 2) Standard and Analysis

The United States Supreme Court has held that a pre-trial identification procedure may be so suggestive and conducive to mistaken identification that subsequent use of that identification at trial would deny the accused due process of law. *Barley v. State*, 906 S.W.2d 27, 32–33 (Tex. Crim. App. 1995) (en banc) (citing *Stovall v. Denno,* 388 U.S. 293 (1967)). Thus, a two-step analysis was formulated to determine the admissibility of an in-court identification: 1) whether the out-of-court identification procedure was impermissibly suggestive, and 2) whether that suggestive procedure gave rise to a very substantial likelihood of irreparable misidentification. *Id.* at 33. These steps require an examination of the totality of the circumstances. *Id.*

In his brief, appellant generally asserts that photographic lineups should depict persons with sufficient similarity in appearance and of the same race, general skin color, age and height. Appellant also notes that the photographic lineups should contain photographs of persons based

–24–

on any description of the offender that a witness has given the police. Appellant does not, however, explain how this particular photographic lineup was unduly suggestive.[3] Based upon our review of the photographs submitted to Helms, the persons selected appear to be of the same race, general skin color, and approximate age. Further, even if appellant had argued a basis for why the lineup was suggestive, he would have had to show that the lineup was impermissibly suggestive by clear and convincing evidence. *Id.* at 33–34. Finally, appellant would have had to also demonstrate by clear and convincing evidence that the identification had been irreparably tainted. *Id.* For these reasons, appellant has not met his burden and we overrule this issue.

### E. Medical Examiner Testimony (Issue 9)

In his ninth issue, appellant argues that the trial court erred in allowing Dr. Barnard, the chief medical examiner for Dallas County, to give his expert opinion on the cause of death. Appellant contends that, under *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), the trial court violated his right to confront witnesses against him because Dr. Barnard neither performed nor was present during the autopsy. Essentially, appellant argues that Dr. Barnard was acting as a conduit expert for another expert's opinion. We disagree.

The Confrontation Clause of the Sixth Amendment, applicable to the states through the Fourteenth Amendment, provides that, "[i]n all criminal prosecutions, the accused shall [have the right] to be confronted with the witnesses against him." U.S. CONST. amend. VI; *see Pointer v. Texas,* 380 U.S. 400, 403 (1965). In *Crawford v. Washington,* 541 U.S. 36 (2004), the Supreme Court held that out-of-court testimonial evidence violates the Confrontation Clause unless the declarant is unavailable to testify and the defendant had a previous opportunity to cross-examine him. *Id.* at 68.

---

[3] Appellant directs the Court to pages 27–91 of the fourth volume of the reporter's record without any additional specificity. *See* TEX. R. APP. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record.").

In *Melendez-Diaz*, the court held that the admission of certificates of analysis, offered by the prosecution in a drug trial, stating that the material seized by police and connected to the defendant was cocaine of a certain quantity, violated the defendant's Sixth Amendment right to confront the witnesses against him. Specifically, the court found that the certificates of analysis were more appropriately described as affidavits and fell within the "core class of testimonial statements" covered by the Confrontation Clause. *Melendez–Diaz,* 557 U.S. at 310. The court reasoned that the certificates were sworn declarations of fact made for the purpose of establishing or proving some fact-namely, that the substance found was cocaine. *Id.* Accordingly, the affidavits were "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* Because the analysts' affidavits were testimonial, the court found the analysts were witnesses for the purposes of the Sixth Amendment. *Id.* Therefore, unless the analysts were unavailable to testify at trial and the defendant had been afforded a prior opportunity to cross-examine them, the Confrontation Clause required that the prosecution call the analysts to testify. *Id.*

The Supreme Court explained nuances in its reasoning in *Bullcoming v. New Mexico,* ⸺ U.S.⸺, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011) regarding "surrogate testimony" in the context of a driving while intoxicated case. In that case, the forensic analyst assigned to test Bullcoming's blood sample created and signed the "Report of Blood Alcohol Analysis." *See id.* at 2710. At trial, the State called a different analyst who was familiar with the laboratory testing procedure but did not participate in or observe the testing on Bullcoming's blood sample. *See id.* at 2709. The Court concluded the admission of the forensic analyst's report concerning blood alcohol concentration was a violation of Bullcoming's right to confrontation because a surrogate analyst, rather than the analyst who prepared the report, testified from the report and lacked an "independent opinion" of the DNA testing. *Id.* at 2715–16.

In a 2012 plurality opinion, however, the Supreme Court concluded the admission of expert testimony regarding the results of DNA testing performed by non-testifying analysts did not violate the Confrontation Clause. *See Williams v. Illinois,* ––– U.S. ––––, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012). In *Williams,* an expert witness relied on a DNA profile procured from a third-party laboratory, Cellmark, which had performed the DNA testing before a suspect was identified in the criminal investigation. *Id.* at 2227–28, 2234. The expert testified as to the following: Cellmark was an accredited lab; the Illinois state police lab occasionally sent forensic samples to Cellmark for DNA testing; the police lab sent vaginal swabs taken from the victim to Cellmark and later received those swabs back from Cellmark; and the Cellmark DNA profile matched a profile produced by the police lab from a sample of the defendant's blood. Because the witness had personal knowledge of each of these matters, the Court held that her testimony did not violate the Confrontation Clause. *Id.* at 2227–29.

Based on the holdings of the foregoing cases, it is clear that cloaking inadmissible testimonial hearsay as an expert opinion does not redeem the character of the evidence. However, that is not what occurred in this case. Here, Dr. Barnard testified that he formed an opinion independent of Dr. Charles Petty—the medical examiner who performed the autopsy— by looking at the photographs. Dr. Barnard noted that he could testify as to the cause of death solely based on the photographs: a gunshot wound to Korper's head indicated Korper died from being shot in the head. Thus, Dr. Barnard had personal knowledge of the facts and testified as to his own interpretation of the cause of death. Further, appellant's counsel cross-examined Dr. Barnard. Based upon our prior opinions and this set of facts, we cannot conclude that the trial court erred in admitting Dr. Barnard's testimony. *See Lightfoot v. State,* No. 05–12–00428, 2013 WL 3871041, at *5 (Tex. App.—Dallas 2013, pet. ref'd) ("Indeed, notwithstanding appellant's reliance on *Bullcoming,* this case is different from other recent cases where we followed

*Bullcoming* because, as the trial court pointed out, Fuller did not serve as a mere conduit for another technical supervisor's conclusions. Instead, she testified regarding what she independently observed and concluded—based [sic] her own experience and after reviewing the maintenance records and logs."); *Hernandez v. State,* No. 05–11–01300–CR, 2013 WL 1282260, at *6 (Tex. App.—Dallas 2013, pet. ref'd) (testimony of expert was not an "after-the-fact explanation" of non-testifying witness's opinion but "an explanation of his independent conclusion in the case."). Appellant's ninth issue is overruled.

### F.  *Motion for Mistrial:  Contact with Jury (Issue 10)*

Appellant argues that the trial court abused its discretion in denying appellant's motion for mistrial due to jury tampering.  We disagree.

The Texas Code of Criminal Procedure provides that "[n]o person shall be permitted to converse with a juror about the case on trial except in the presence and by the permission of the court."  TEX. CODE CRIM. PROC. ANN. art. 36.22 (West 2006).  A violation of Article 36.22, once proven by the defendant, triggers a rebuttable presumption of injury to the accused and a mistrial may be warranted.  *Ocon v. State,* 284 S.W.3d 880, 884 (Tex. Crim. App. 2009).  When determining whether the State sufficiently rebutted the presumption of harm, we view the evidence in the light most favorable to the trial court's ruling and defer to the trial court's resolution of historical facts and its determinations concerning credibility and demeanor.  *Id.*  A trial court's denial of a motion for mistrial is reviewed for an abuse of discretion.  *See Coble v. State,* 330 S.W.3d 253, 292 (Tex. Crim. App. 2010).  A mistrial is as an extreme remedy for prejudicial events occurring during the trial process and should be granted only when residual prejudice remains after less drastic alternatives are explored.  *Ocon,* 284 S.W.3d at 884.

In this case, Mr. Korper, the victim's father, approached one of the jurors on a break during the trial and asked what her number was.  The juror responded that she didn't know that

she had a number and that she was not allowed to give out any information. Mr. Korper then told the juror that he wanted the number of a different juror. The juror told Mr. Korper to speak with the bailiff and then she reported this interaction to the bailiff. The court then questioned both jurors and asked if they felt intimidated or threatened in any way. They both answered no. The court then asked if this interaction would affect their service as a juror. Both again answered no. As the conversation between the juror and the bailiff took place in front of the other jurors, the court then questioned the remaining jurors and asked if they were threatened or intimidated by what had occurred and whether it would affect their service. Each juror answered no.

Article 36.22 provides that "[n]o person shall be permitted to converse with a juror about the case on trial except in the presence and by the permission of the court." The communication at issue in this case may have constituted juror misconduct in violation of Article 36.22. A violation of Article 36.22, however, does not automatically warrant a mistrial. *See Ocon* at 885. Although it is generally presumed that a defendant is injured whenever an empaneled juror converses with an unauthorized person about a case, the defendant has the burden to establish that if a conversation did occur between a nonsequestered juror and someone else that the discussion involved matters concerning the specific case at trial. *See Chambliss v. State*, 647 S.W.2d 257, 265–66 (Tex. Crim. App. 1983) (en banc) (holding that defendant was not prejudiced by conversation during break in trial between one of the jurors and the victim's sister because record did not show that defendant's case was discussed). Here, as in *Chambliss*, the conversation between the victim's father and the juror had nothing to do with the merits of the case. Further, the trial court spoke with each of the jurors and each juror separately verified that they were neither intimidated by the conversation nor concerned that it would affect their service. Based upon the particular facts of this case and the evidence submitted to the trial court,

we cannot say that the trial court abused its discretion in denying appellant's motion for mistrial. Accordingly, we overrule appellant's tenth issue.

### G. Objection to Jury Argument (Issue 11)

Appellant argues that the trial court abused its discretion in overruling his objection to the prosecutor's closing argument that appellant sexually assaulted the victim's mother before the murders. We disagree.

There are four permissible areas of jury argument: (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) answering arguments of opposing counsel; and (4) pleas for law enforcement. *See Felder v. State*, 848 S.W.2d 85, 94–95 (Tex. Crim. App. 1992) (en banc). Argument which exceeds these areas is erroneous. *Id.* at 95. Counsel, however, is allowed wide latitude without limitation in drawing inferences from the evidence so long as the inferences drawn are reasonable, fair, legitimate, and offered in good faith. *Gaddis v. State*, 753 S.W.2d 396, 398 (Tex. Crim. App. 1988).

In this case, the following exchange took place during the State's closing argument:

| | |
|---|---|
| State: | Now, you will remember in voir dire I told you the State doesn't have to prove motive. It's not one of the elements, but guess what, we've got a motive in this case. You see, George Washington Hicks sexually assaulted Roxanne Jeeves shortly before the murders. We know that. We know that because his semen is inside of Roxanne. His semen is all over her panties, and the way they are in the panties indicate that she did not walk around. |
| Appellant's counsel: | Your Honor, we would object to that as being outside the evidence. |
| The Court: | Overruled. |
| State: | That evidence that you heard indicates that the sexual assault occurred shortly before the murders. |

Appellant argues that this argument should not have been allowed because it was unsupported by the record. The State, however, argued that these comments during closing argument stemmed from the testimony of the Benita Boyd and Tim Fallon. Boyd, a forensic serologist, testified that

–30–

as a former employee of Southwestern Institute of Forensic Sciences that it was her job to identify and classify blood and body fluids as well as evidence from a rape kit collected during an autopsy. Boyd testified that she examined vaginal, anal, and oral swabs and smears from the Jeeves's autopsy for the presence of seminal fluid and acid phosphatase. The swabs and smears indicated the presence of sperm and that Jeeves had not washed or cleaned her genital area or had a bowel movement after the semen was deposited. Jennifer Smith, a DNA analyst and forensic scientist, examined Jeeves's underwear and panty liner for the presence of DNA. Smith testified that she recovered sperm cells from the underwear and matched the DNA in the sperm cells to appellant. In addition, Tim Fallon, a trace evidence analyst, testified that it was his job to examine hairs, fibers, chemical residues, gunshot residues, and other items for criminal and civil investigations. He testified that the small bottle of liquid recovered at the crime scene was ethyl ether and water which could be used as an anesthetic. Based upon this evidence presented at trial, we conclude that it was reasonable for the State to infer the possibility that the appellant raped Jeeves. Accordingly, no improper reference to matters outside the record was made and we overrule appellant's eleventh issue.

### H. *Legal Insufficiency of the Evidence (Issue 12)*

Appellant argues that the evidence is insufficient to support a finding of guilt for the offense of murder. When an appellant challenges the sufficiency of the evidence to support a conviction, we review all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012). Evidence is sufficient if "the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict." *Id.* If the evidence is conflicting, we "'presume that the factfinder resolved the conflicts in favor of the

prosecution and defer to that determination." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 326 (1979)).

A person commits the offense of murder if such person "intentionally or knowingly causes the death of an individual" or "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." TEX. PENAL CODE ANN. § 19.02(b)(1)–(2) (West 2011). A culpable mental state is generally proved by circumstantial evidence. *Dillon v. State*, 574 S.W.2d 92, 94 (Tex. Crim. App. [Panel Op.] 1978); *Krause v. State*, 243 S.W.3d 95, 111 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd). A jury may infer intent to cause death from the use of a deadly weapon in a deadly manner. *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996) (jury may infer intent to kill from use of deadly weapon unless it would not be reasonable to infer that death or serious bodily injury could result from use of weapon); *Adanandus v. State*, 866 S.W.2d 210, 215 (Tex. Crim. App. 1993) (if deadly weapon used in deadly manner, inference is "almost conclusive" that defendant intended to kill); *Jackson*, 115 S.W.3d at 329. Appellant argues that the State failed to present sufficient evidence at trial to convict him of murder. We disagree.

In this murder trial, the State presented over twenty witnesses. As summarized above, appellant shot the victim in the head at close range from which the jury could conclude he intended to cause the victim's death. As for the appellant's identification as the assailant, appellant's own DNA—hair, fingerprint, semen—all positively linked him to the crime scene. Other physical evidence also linked appellant to the crime scene. Appellant's former brother-in-law and stepson both identified the blue bag found in Jeeves's car as belonging to appellant. They testified that the blue bag was kept in the bedroom closet and contained a holster, gun, duct tape and rope. Further, they testified that appellant often wore toboggan hats with pins with little sayings on them. Deputy Sheriff Lieutenant Sparks testified that the "E. Oden" notebook found

at the murder scene belonged to Eugene Oden who worked at an office building where appellant performed cleaning services.

Other witnesses saw Jeeves and the victim with an African-American man on the morning of December 23, 1981. Patricia McAvey, Jeeves's next door neighbor, saw an African-American man holding the victim's hand at the apartment complex. Detective Forsyth spoke with a gas station attendant who stated that Jeeves was driving the car with an African-American man in the front seat and a child in the backseat around 9:30 am or 10:00 a.m. on the day of the murders. Another witness—Tamera Tignor—was near the crime scene on the day of the murders to pick up her grandmother. She saw a "dark complexioned" man running across a field toward Cartwright Road on the morning of December 23, 1981. Connie Helms, who was visiting her father in the area of Lawson and Cartwright Roads on December 23, 1981, heard gunfire and then saw a man coming down the road. The man stopped at the house and asked for a drink of water and to use the phone. Tignor described the man as a black man with full cheeks, buggy eyes, and unruly hair. She called the police after seeing the murders featured on Unsolved Mysteries and told the officer that she thought she could recognize the suspect. Tignor later identified appellant in a photo line-up.

When considered in the light most favorable to the verdict, the facts in this case were sufficient to support a conviction of murder. We overrule appellant's twelfth issue.

## I.    *Back Time Credit for Incarceration (Issue 13)*

Appellant argues that he is entitled to back time credit beginning on March 14, 2003, when the original indictment for this crime was issued. The State concedes that appellant is entitled to some additional time and we agree.

Appellant is governed by the law which was in effect at the time of the murders. *See* Act of June 19, 1993, 73rd Leg., R.S., ch. 900, § 5.09(B), 1993 Tex. Gen. Laws 3764 ("An offense

–33–

committed before the effective date of this article is covered by the law in effect when the offense was committed, and the former law is continued in effect for that purpose."). The version of the Code of Criminal Procedure in effect at the time of the 1981 murders provides as follows:

> Sec. 2. (a) In all criminal cases the judge of the court in which the defendant was convicted shall give the defendant credit on his sentence for the time that the defendant has spent in jail in said cause, from the time of his arrest and confinement until his sentence by the trial court.

*See* Act of May 14, 1981, 67th Leg., R.S., ch. 141, § 1, sec. 2(a), 1981 Gen. Laws 353 (amended 1993 & 2007).[4]

### 1)      Back time credit under first indictment (Cause No. F03-21911)

On April 16, 2003, the Texas Department of Criminal Justice informed the Dallas County Sheriff's Office that notations had been made in their records that appellant would be wanted by your office upon release from their institution.[5] The letter referenced cause numbers F03-21910 (murder of Jeeves) and F03-21911 (murder of Korper). An arrest warrant was issued for appellant on April 29, 2003, but was recalled. A bench warrant was issued on June 2, 2003, and appellant was returned to the Dallas jail.

Another bench warrant was executed on September 15, 2005. After appellant was convicted on January 29, 2007 in cause number F03-21910, the judgment credited him with time served from September 15, 2005 to January 29, 2007. On April 11, 2007, the trial court entered a nunc pro tunc in cause number F03-21910 crediting appellant with additional time served from April 16, 2003 until February 16, 2005 and September 15, 2005 through January 29, 2007.

---

[4] The current version of this article can be found at TEX. CODE CRIM. PROC. art. 42.03, § 2(a) (West. Supp. 2014).

[5] At the time of the original indictments, appellant was serving a sentence with the Texas Department of Criminal Justice on another conviction.

**2) Back time credit under second indictment (Cause No. F11-00837)**

In this case, a bench warrant was issued on March 15, 2012. The judgment in this case credits appellant with back time for the time period of March 14, 2012 through March 28, 2014 for time served under the second indictment.

**3) Analysis**

Appellant is entitled to credit for any time served in jail on either the first or second indictment for Korper's murder. *See Ex parte Hernandez*, 845 S.W.2d 913, 914 (Tex. Crim. App. 1993) (en banc). Appellant was indicted for Korper's murder in April 2003 and that case was not dismissed until February 19, 2007. Accordingly, the time credited to appellant in the nunc pro tunc order for Jeeves's murder should also be credited to appellant for Korper's murder since he was being held for both causes. *Id.* ("It is well-settled that an individual is entitled to all time 'spent in jail in said cause.'")). Thus, appellant should be credited for time served from April 16, 2003 until February 16, 2005 and September 15, 2005 through February 19, 2007, in addition to the time period of March 14, 2012 through March 28, 2014 which was already included in the judgment.

**III. CONCLUSION**

We modify the judgment with respect to back-time credit and affirm the judgment as modified.

/ David Evans/
DAVID EVANS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
140417F.U05

–35–



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

GEORGE WASHINGTON HICKS,
Appellant

No. 05-14-00417-CR  V.

THE STATE OF TEXAS, Appellee

On Appeal from the 363rd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F11-00837-W.
Opinion delivered by Justice Evans.
Justices Myers and Brown participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

Appellant is credited for time served from April 16, 2003 until February 16, 2005 and September 15, 2005 through February 19, 2007 and March 14, 2012 through March 28, 2014.

As **REFORMED**, the judgment is **AFFIRMED**.

Judgment entered this 21st day of July, 2015.

–36–